**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 18-CR-68 (BAH)** |
| | : | |
| **MICHAEL AFRAM ORJI,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. The government recommends that the defendant, Michael Afram Orji (the "Defendant"), be sentenced to a term of imprisonment of 87 months, which represents the middle of the Estimated Guidelines Range in the parties' plea agreement, to be followed by five years of supervised release. The government respectfully submits that such a sentence would adequately serve the interests of justice as codified in 18 U.S.C. § 3553(a). In support of this motion, and to assist the Court in fashioning an appropriate sentence, the Government submits the following:

## FACTUAL AND PROCEDURAL BACKGROUND

The government adopts and incorporates herein the facts as set forth in the Un-Redacted Statement of Offense and Redacted Statement of Offense, *see* ECF No. 18. The Defendant was a prolific fraudster. Over the course of more than two years, from in or about August 2015 through November 2017, he conspired to participate in at least seven bank fraud schemes involving at least 10 victims and more than $5.7 million in intended losses. The Defendant was also a highly sophisticated money launderer, who worked with a network of co-conspirators to rapidly launder fraud proceeds and ensure that victims, once defrauded, could not recover their losses.

The Defendant was apprehended as a result of an investigation involving the Federal Bureau of Investigation, U.S. Secret Service, Federal Deposit Insurance Corporation-Office of Inspector General, U.S. Postal Inspection Service, the District of Columbia Office of Inspector General, and the Metropolitan Police Department.

The Defendant's fraud schemes primarily involved either stolen checks or business e-mail compromise ("BEC") schemes.   In a typical stolen check scheme, the Defendant and/or co-conspirators would obtain large-dollar stolen checks intended for third parties, establish sham corporations and bank accounts in the names of the third parties for whom the checks were intended, and deposit or attempt to deposit the stolen checks into the sham bank accounts under the control of the Defendant or co-conspirators.   In a typical BEC scheme, a co-conspirator working online would trick a company or individual using "spoofed," or fake, e-mails into transferring large sums of money into bank accounts controlled by the Defendant or other members of the conspiracy for a fictitious transaction.   The Defendant typically used false aliases and forged driver's licenses to establish the bank accounts used in the schemes.

After receiving the fraud proceeds, the Defendant and/or co-conspirators would then knowingly conduct or attempt to conduct a variety of laundering transactions to drain the proceeds from the bank accounts, for the purpose of concealing or disguising the nature, location, source, ownership, or control of the criminal proceeds.   As with the accounts used to facilitate the underlying bank fraud offenses, the Defendant typically used false aliases and forged driver's licenses in laundering the proceeds of the fraud.

Specific schemes in furtherance of the conspiracy are described below:

## VICTIM 1

VICTIM 1 is a company in Baltimore, Maryland.   On or about December 9, 2015, VICTIM 1 issued a check for $291,086.66 payable to the TENNESSEE COMPANY, a company with which VICTIM 1 had worked for over three years.   On or about January 7, 2016, the TENNESSEE COMPANY notified VICTIM 1 that it never received the check.

On or about December 17, 2015, a new business entity was registered in Maryland under a name similar to that of the TENNESSEE COMPANY.   On or about December 21, 2015, the Defendant entered a PNC Bank branch in Laurel, Maryland and provided a false Ohio driver's license in the name of Walter Douglas to open two business bank accounts in the name of the above-referenced similar name, PNC Bank Account 2318and PNC Bank 2326.

On or about December 23, 2015, the Defendant caused a third party to deposit the $291,086.66 check from VICTIM 1 into PNC Bank Account 2318.   Following that deposit, the Defendant drained the account through transactions including cash withdrawals, checks, and transfers to other bank accounts.   Relevant transactions are summarized below:

**Table 1:   PNC Account 2318, in name similar to that of TENNESSEE COMPANY**

| Date | Amount | Transaction |
|------|--------|-------------|
| **12/23/15** | **$291,086.66** | **Check deposit from VICTIM 1** |
| 12/29/15 | $5,000.00 | Cash withdrawal |
| 12/29/15 | $185,000.00 | Telephone transfer to PNC Account 6681 in the name of CO-CONSPIRATOR COMPANY 1 |
| 12/31/15 | $8,000.00 | Cash withdrawal |
| 12/31/15 | $70,000.00 | Wire transfer to CO-CONSPIRATOR COMPANY 2 |
| 1/4/16 | $15,000.00 | Cashier's check to CO-CONSPIRATOR COMPANY 3 |
| 1/4/16 | $5,000.00 | Cash withdrawal |
| 1/8/16 | $2,800.00 | Check to CO-CONSPIRATOR COMPANY 1 |

On or about December 29, 2015, a telephone transfer of $185,000 was initiated from PNC Account 2318 into PNC Account 6681, held in the name of CO-CONSPIRATOR COMPANY 1. On or about January 8, 2015, a check was written in the amount of $2,800, drawn on PNC Account 2318, and deposited into PNC Account 6681, held in the name of CO-CONSPIRATOR COMPANY 1.

In fact, CO-CONSPIRATOR COMPANY 1 was another shell company established by the Defendant to launder the proceeds of this (and other) schemes.   The Defendant had previously opened PNC Account 6681 in the name of CO-CONSPIRATOR COMPANY 1 on or about September 14, 2015, using the false alias Glenn Briggs.   CO-CONSPIRATOR COMPANY 1 was registered as a business entity in Maryland on or about August 17, 2015, listing Glenn Briggs as the resident agent.

Beginning on or about December 29, 2015, the Defendant drained PNC Account 6681 in the name of CO-CONSPIRATOR COMPANY 1 through cash withdrawals, a cashier's check, a wire transfer, and other transactions.   Relevant transactions are summarized below:

**Table 2:   PNC Account 6681, CO-CONSPIRATOR COMPANY 1**

| Date | Amount | Transaction |
|---|---|---|
| **12/29/15** | **$185,000.00** | **Telephone transfer from PNC Account 2318** |
| 12/29/15 | $8,000.00 | Cash withdrawal |
| 12/29/15 | $140,000.00 | Wire transfer to CO-CONSPIRATOR COMPANY 4 |
| 12/31/15 | $7,500.00 | Cash withdrawal |
| 1/4/16 | $25,000.00 | Cashier's check to CO-CONSPIRATOR COMPANY 4 |
| **1/8/16** | **$2,800.00** | **Check deposit from PNC Account 2318** |
| 1/8/16 | $600.00 | ATM withdrawal |

**VICTIM 2**

VICTIM 2 is an individual with an account at Capital One Bank.   On or about August 18, 2015, VICTIM 2 notified Capital One Bank that VICTIM 2 would be traveling internationally until on or about August 30, 2015.   The call was received by CO-CONSPIRATOR 1.   On or about the same day, August 18, 2015, an individual claiming to be VICTIM 2 placed an expedited check order for VICTIM 2's checking account.   The checks were sent while VICTIM 2 was out of the country.

On or about August 21, 2015, CO-CONSPIRATOR 1 impersonated VICTIM 2 in a call to Capital One customer service to request a transfer of $130,000.00 from VICTIM 2's savings account into VICTIM 2's checking account.   Within days, the $130,000.00 was liquidated through two fraudulent checks: a check for $92,000.00 payable to CO-CONSPIRATOR COMPANY 5, negotiated on or about August 24, 2015; and a check for $43,000.00 payable to CO-CONSPIRATOR COMPANY 1, negotiated on or about August 25, 2015.

The Defendant opened Capital One Account 7983 in the name of CO-CONSPIRATOR COMPANY 1 on or about August 21, 2015, in the District of Columbia, using the false alias Glenn Briggs.   Significantly, this was just three days after VICTIM 2 notified Capital One Bank about VICTIM 2's upcoming travel, and it was *the same day* that CO-CONSPIRATOR 1 fraudulently impersonated VICTIM 2 to Capital One to request the transfer of VICTIM 2's assets.

The Defendant then deposited the $92,000.00 check from VICTIM 2's account into Capital One Account 7983 on or about August 25, 2015.   The Defendant then rapidly liquidated the proceeds through ATM withdrawals, cash withdrawals, outgoing checks, and debit card purchases.

**VICTIM 3**

VICTIM 3 is an individual with a retirement account at Charles Schwab.   On or about August 27, 2015, the third-party administrator of VICTIM 3's retirement account was fraudulently induced into making a wire transfer in the amount of $170,000.00 from VICTIM 3's retirement account into TD Bank Account 2079.   On or about September 4, 2015, the third-party administrator was fraudulently induced into making another wire transfer in the amount of $170,000.00 from VICTIM 3's retirement account into TD Bank Account 2079.

In fact, the Defendant opened TD Bank Account 2079 on or about August 20, 2015, in the name of CO-CONSPIRATOR COMPANY 1.   The Defendant used the false alias Glenn Briggs in opening the bank account.   Following the fraudulent wire transfers from VICTIM 3's retirement account, the Defendant rapidly liquidated the proceeds through ATM withdrawals, debit card purchases, and wire transfers.   Relevant transactions are summarized below:

**Table 3:   TD Bank Account 2079, CO-CONSPIRATOR COMPANY 1**

| Date | Amount | Transaction |
|------|-------:|-------------|
| **8/27/15** | **$170,000.00** | **Wire transfer from VICTIM 3's retirement account** |
| 9/1/15 | $605.99 | ATM withdrawal |
| 9/1/15 | $80,000.00 | Wire transfer to CO-CONSPIRATOR COMPANY 4 |
| 9/1/15 | $60,000.00 | Wire transfer to CO-CONSPIRATOR COMPANY 6 |
| 9/1/15 | $5,000.00 | Cash withdrawal |
| 9/3/15 | $700.00 | ATM withdrawal |
| **9/4/15** | **$170,000.00** | **Wire transfer from VICTIM 3's retirement account** |
| 9/8/15 | $78,150.20 | Wire transfer to CO-CONSPIRATOR COMPANY 4 |
| 9/8/15 | $71,200.00 | Wire transfer to CO-CONSPIRATOR COMPANY 7 |
| 9/8/15 | $3,000.00 | Cash withdrawal |
| 9/11/15 | $18,000.00 | Wire transfer to CO-CONSPIRATOR COMPANY 4 |
| 9/14/15 | $603.50 | ATM withdrawal |

**VICTIM 4 and VICTIM 5**

VICTIM 4 is a company based in Branchburg, New Jersey.   VICTIM 5 is a company based in Maplewood, New Jersey.   The ILLINOIS COMPANY is a company with an address in Chicago, Illinois.

On or about November 7, 2016, the Defendant traveled by airline from Arlington, Virginia to Boston, Massachusetts, using the false alias Marc Bennett.   On or about November 7, 2016, in Rhode Island, the Defendant opened Citizens Bank Account 6958 and Citizens Bank Account 6893, under a name similar to that of the ILLINOIS COMPANY, except the accounts were associated with an address in Providence, Rhode Island.   The Defendant used the false alias Tony Johnson in opening the accounts.

On or about November 10, 2016, the Defendant deposited a stolen check in the amount of $1,482,496.40 from VICTIM 4 and payable to the ILLINOIS COMPANY into Citizens Bank Account 6958.   Also on or about November 10, 2016, the Defendant deposited a stolen check in the amount of $332,418.89 from VICTIM 5 and payable to the ILLINOIS COMPANY into Citizens Bank Account 6893.   The Defendant was unsuccessful in withdrawing any of the funds from this scheme.

**VICTIM 6**

VICTIM 6 is a company based in Houston, Texas.   On or about January 31, 2017, VICTIM 6 was fraudulently induced into making a wire transfer in the amount of $1,792.68 into Wells Fargo Account 3302 in the name of CO-CONSPIRATOR COMPANY 8.   On or about February 2, 2017, VICTIM 6 was fraudulently induced into making another wire transfer in the

amount of $379,000.00 into Wells Fargo Account 3302.    VICTIM 6 mistakenly believed it was making payments to a business partner.

In fact, the Defendant opened Wells Fargo Account 3302 on or about December 19, 2016, in the name of CO-CONSPIRATOR COMPANY 8, using the false alias Brian Hinsley. Following the fraudulent wire transfers from VICTIM 6, the Defendant rapidly liquidated the proceeds through ATM withdrawals, cash withdrawals, debit card purchases, and wire transfers. Relevant transactions are summarized below:

**Table 4:   Wells Fargo Account 3302, CO-CONSPIRATOR COMPANY 8**

| Date | Amount | Transaction |
|------|--------|-------------|
| **1/31/17** | **$1,792.68** | **Wire transfer from VICTIM 6** |
| **2/2/17** | **$379,000.00** | **Wire transfer from VICTIM 6** |
| 2/2/17 | $92,750.15 | Check to CO-CONSPIRATOR COMPANY 9 |
| 2/3/17 | $6,670.00 | Check to CO-CONSPIRATOR 2 |
| 2/3/17 | $5,920.75 | Check to CO-CONSPIRATOR 3 |
| 2/3/17 | $6,815.55 | Check to CO-CONSPIRATOR 4 |
| 2/3/17 | $7,260.30 | Check to CO-CONSPIRATOR 5 |
| 2/3/17 | $87,540.25 | Check to CO-CONSPIRATOR COMPANY 10 |
| 2/3/17 | $98,240.50 | Check to CO-CONSPIRATOR COMPANY 11 |
| 2/6/17 | $304.99 | ATM withdrawal |
| 2/7/17 | $200.00 | ATM withdrawal |
| 2/7/17 | $5,000.00 | Cash withdrawal |
| 2/7/17 | $5,470.80 | Check to CO-CONSPIRATOR 3 |
| 2/7/17 | $6,250.40 | Check to CO-CONSPIRATOR 6 |
| 2/8/17 | $8,500.00 | Check to CO-CONSPIRATOR 4 |
| 2/8/17 | $4,500.00 | Check to CO-CONSPIRATOR 3 |
| 2/8/17 | $5,750.75 | Check to CO-CONSPIRATOR 7 |
| 2/8/17 | $7,140.25 | Check to CO-CONSPIRATOR 8 |
| 2/8/17 | $6,407.40 | Check to CO-CONSPIRATOR 9 |
| 2/8/17 | $7,540.00 | Check to CO-CONSPIRATOR 10 |
| 2/8/17 | $8,237.15 | Check to CO-CONSPIRATOR 11 |
| 2/9/17 | $5,850.00 | Check to CO-CONSPIRATOR 12 |

The Defendant opened Citibank Account 8636 on or about December 20, 2016, in the name of CO-CONSPIRATOR COMPANY 9, using the false alias Brian Hinsley.   On or about February 2, 2017, the Defendant deposited the above-mentioned check in the amount of $92,750.15 into Citibank Account 8636.   After the deposit, the Defendant drained the account through transactions including a cash withdrawal, ATM withdrawals, and debit card purchases.

The Defendant opened Bank of America Account 6583 on or about September 27, 2016, in the name of CO-CONSPIRATOR COMPANY 10, using the false alias Marc Bennett.   On or about February 2, 2017, the Defendant deposited the above mentioned check (in Table 4) for $87,540.25 payable to CO-CONSPIRATOR COMPANY 10 into Bank of America Account 6583. Following the check deposit, the Defendant drained the account through transactions including cash withdrawals, outgoing wire transfers, and a cashier's check in the amount of $48,540.40, purchased on or about February 6, 2017, and payable to CO-CONSPIRATOR COMPANY 9.

**<u>VICTIM 7</u>**

VICTIM 7 is an individual in New Jersey.   On or about August 2, 2017, VICTIM 7 was fraudulently induced into making a wire transfer in the amount of $63,000.00 into TD Bank Account 2526.   VICTIM 7 mistakenly believed the payment was going to an attorney in connection with the purchase of a home.

In fact, the Defendant opened TD Bank Account 2526 on or about May 15, 2017 in the name of CO-CONSPIRATOR COMPANY 12, using the false alias John Dwayne Lawler.   On or about the same date, the Defendant opened several other associated TD Bank accounts in the name of CO-CONSPIRATOR COMPANY 12, using the false alias John Dwayne Lawler, including account numbers ending in 2542, 2568, and 2534.   Following the fraudulent wire

transfer from VICTIM 7, the Defendant rapidly liquidated the proceeds through transactions including online transfers to associated accounts in the name of CO-CONSPIRATOR COMPANY 12, ATM withdrawals, and checks.   Relevant transactions are summarized below:

**Table 5:   TD Bank Account 2526, CO-CONSPIRATOR COMPANY 12**

| Date | Amount | Transaction |
|------|--------|-------------|
| **8/2/17** | **$63,000.00** | **Wire transfer from VICTIM 7** |
| 8/2/17 | $6,000.00 | Online transfer to TD Bank account number ending in 2542 in the name of CO-CONSPIRATOR COMPANY 12 |
| 8/2/17 | $5,200.00 | Online transfer to TD Bank account number ending in 2568 in the name of CO-CONSPIRATOR COMPANY 12 |
| 8/2/17 | $5,000.00 | Online transfer to TD Bank account number ending in 2534 in the name of CO-CONSPIRATOR COMPANY 12 |
| 8/2/17 | $703.00 | ATM withdrawal |
| 8/3/17 | $5,965.00 | Check to CO-CONSPIRATOR 13 |
| 8/3/17 | $7,950.00 | Check to CO-CONSPIRATOR 14 |
| 8/3/17 | $25,000.00 | Check to CO-CONSPIRATOR 15 |
| 8/3/17 | $6,785.00 | Check to CO-CONSPIRATOR 16 |
| 8/4/17 | $704.99 | ATM withdrawal |
| **8/4/17** | **$5,000.00** | **Online transfer from TD Bank account number ending in 2568 in the name of CO-CONSPIRATOR COMPANY 12** |
| **8/7/17** | **$2,000.00** | **Online transfer from TD Bank account number ending in 2542 in the name of CO-CONSPIRATOR COMPANY 12** |
| 8/7/17 | $600.00 | Online transfer to TD Bank account number ending in 2534 in the name of CO-CONSPIRATOR COMPANY 12 |
| 8/8/15 | $1,800.00 | Online transfer to TD Bank account number ending in 2534 in the name of CO-CONSPIRATOR COMPANY 12 |

In this scheme, part of the Defendant's laundering methodology was to layer the criminal proceeds from VICTIM 7 through other fraudulent accounts the Defendant also opened at TD Bank, including TD Bank accounts ending in ending in 2542, 2568, and 2534.

Specifically, following the above-mentioned online transfer in the amount of $6,000.00 into TD Bank account number ending in 2542, the Defendant drained the account through an ATM

withdrawal, debit card purchases, and a return online transfer in the amount of $2,000.00 back into TD Bank Account 2526 on or about August 7, 2017.

Following the above-mentioned online transfer in the amount of $5,200.00 into TD Bank account number ending in 2568, the Defendant made a return online transfer in the amount of $5,000.00 back into TD Bank Account 2526 on or about August 4, 2017.

Following the above-mentioned online transfers in the amounts of $5,000.00, $600.00, and $1,800.00 into TD Bank account number ending in 2534, the Defendant drained the account through ATM withdrawals and debit card purchases.

## **VICTIM 8**

VICTIM 8 is a public school system in a U.S. city.   The Defendant targeted VICTIM 8 in two separate business e-mail compromise schemes.

First, on or about September 8, 2017, VICTIM 8 was fraudulently induced into making an ACH payment in the amount of $478,440.69 into BB&T Account 3627.   On or about September 15, 2017, VICTIM 8 was fraudulently induced into making another ACH payment in the amount of $60,000.00 into BB&T Account 3627.

In fact, the Defendant opened BB&T Account 3627 on or about June 29, 2017, in the name of CO-CONSPIRATOR COMPANY 13, using the false alias Christopher Lowell.   Following the fraudulent wire transfer from VICTIM 7, the Defendant rapidly liquidated the proceeds through transactions including online transfers to an associated BB&T account in the name of CO-CONSPIRATOR COMPANY 13, ATM withdrawals, and checks.   Relevant transactions are summarized below:

**Table 6:   BB&T Account 3627, CO-CONSPIRATOR COMPANY 13**

| Date | Amount | Transaction |
|------|-------:|-------------|
| **9/8/17** | **$478,440.69** | **ACH transfer from VICTIM 8** |
| 9/8/17 | $20,000.00 | Online transfer to BB&T account number ending in 3635 in the name of CO-CONSPIRATOR COMPANY 13 |
| 9/11/17 | $500.00 | ATM withdrawal |
| 9/11/17 | $91,530.47 | Check to CO-CONSPIRATOR 17 |
| 9/12/17 | $87,421.10 | Check to CO-CONSPIRATOR COMPANY 14 |
| 9/13/17 | $151,364.19 | Check to CO-CONSPIRATOR COMPANY 15 |
| **9/15/17** | **$60,000.00** | **ACH transfer from VICTIM 8** |
| 9/18/17 | $116,345.64 | Check to CO-CONSPIRATOR 18 |
| 9/18/17 | $50,000.00 | Online transfer to BB&T account number ending in 3635 in the name of CO-CONSPIRATOR COMPANY 13 |
| 9/19/17 | $600.00 | ATM withdrawal |

Following the above-mentioned online transfers in the amounts of $20,000.00 and $50,000.00 into BB&T account number ending in 3635, the Defendant partially drained the account through debit card purchases and an ATM withdrawal in the amount of $600.00 on or about September 19, 2017.

Second, in addition, on or about September 15, 2017, VICTIM 8 was fraudulently induced into making an ACH payment in the amount of $2,106,203.43 into TD Bank Account 2526.   As noted above, TD Bank Account 2526 was opened by the Defendant under the name CO-CONSPIRATOR COMPANY 12, using the false alias John Dwayne Lawler.   This fraudulent payment was reversed on or about September 22, 2017, before the Defendant could access the funds.

**VICTIMS 9 and 10**

VICTIM 9 is a company based in Austin, Texas.   VICTIM 10 is a company based in Trophy Club, Texas corresponding to a medical center.

On or about September 6, 2017, an envelope addressed to a close relative of the Defendant was sent by mail to a luxury apartment building in the District of Columbia.   In fact, the Defendant was living at the specified address under a lease in the name of his close relative. Pursuant to a search warrant, federal agents intercepted the envelope before it could be delivered to the Defendant.   *See* No. 17-mj-797 (D.D.C. Oct. 30, 2017) [Under Seal].

Inside the envelope, an inner envelope held two checks.   The first check was issued on or about August 3, 2017 by VICTIM 9, in the amount of $29,209.48.   The check was originally made payable to a business partner of VICTIM 9, but the check was altered to appear payable to CO-CONSPIRATOR COMPANY 19.   The second check was issued on or about August 24, 2017 by VICTIM 10, in the amount of $23,948.00.   The check was originally made payable to a business partner of VICTIM 10, but the check was altered to appear payable to CO-CONSPIRATOR 19.   If the checks had been allowed to reach the Defendant, he and his co-conspirators would have deposited and laundered them, as they had done in the other schemes.

## A.  Search Warrant and Arrest

On November 20, 2017, federal agents executed a search warrant on the Defendant's luxury apartment in the District of Columbia.   Agents recovered, among other things:

- 14 false driver's licenses bearing the Defendant's photograph and the names of assorted false aliases, including aliases with the initials J.D.L., C.T.L., D.L.J., M.J.B., J.F., W.J.B., J.M.C., D.R.W., E.C.W., M.B., and J.H.   *See* Ex. A.

- 3 false driver's licenses bearing a female co-conspirator's photograph and the names of the co-conspirator's false aliases.   *See id.*

- 1 false Social Security Card in the name of the Defendant's false alias, C.T.L.   *See id.*

- Several MGM Casino cards in the name of the Defendant's false alias, M.B.   *See id.*

- A printed-out copy of the Wikipedia article on "Bank Fraud."   *See* Ex. B.

- A copy of a journal article entitled, "Automating Online Banking Fraud-Automatic Transfer System: The Latest Cybercrime Toolkit Feature," with key passages underlined by hand.   *See* Ex. C.

- Books and materials about identity theft and creating false aliases, including the book *The Paper Trip I*, with handwritten notes and underlining, and a catalog of books entitled "The Ultimate Guides to New Identity."   *See* Ex. D (excerpts); Ex. E.

- Handwritten notes that appear to pertain to obtaining a line of credit through a shell company.   *See* Ex. F.

- One iPhone and seven Samsung mobile phones, which contained WhatsApp chats and embedded photographs relating to a variety of bank fraud and BEC schemes. WhatsApp is an encrypted messaging application.

On the same day, the Defendant was arrested pursuant to a criminal complaint and arrest warrant related to the scheme involving VICTIM 1.   *See United States v. Orji*, No. 17-mj-876. During his initial appearance on November 20, 2017, the Defendant falsely asserted through counsel (twice) that he was a U.S. citizen, even though he is a Nigerian citizen who has litigated his immigration status and is subject to a prior order of removal.   *See United States v. Orji*, No. 17-mj-876, 11/20/17 Tr. at 8:1-2, 8:16; Ex. G (May 9, 2012 Immigration Court Order ordering Defendant's removal from United States).

**B.  Jail Calls**

Immediately following his arrest, the Defendant began to reach out to co-conspirators from D.C. Jail to instruct them *to continue committing fraud*.   For example, on or about November 20, 2017, the Defendant placed a call to INDIVIDUAL A, and asked INDIVIDUAL A to contact a

female co-conspirator, CO-CONSPIRATOR A ("CC-A").     The Defendant provided INDIVIDUAL A with the following instructions regarding CC-A and a second co-conspirator, CO-CONSPIRATOR B ("CC-B"):

> Defendant:    Yeah, when you talk to her, just let her know everything's good, she should still do what she's doing, just make sure she check everything and tell her to send you a screenshot to your WhatsApp, of everything, like you know. . . . I'll explain everything when I see you, just tell her that everything's still good, that she should just check the stuff on Wednesday. If everything is good, you know, she should just proceed as, what's it called. Once you tell her that, you know, everything is good.   [CC-B] gave her some work to do, you know.   I was supervising. . . . There's some money still, there's some money still that she's, she just needs to, you know, communicate with you and [CC-B].   Give her [CC-B's] number, so [CC-B], so you don't have to talk to, you know, just tell [CC-B] to talk to her, and what's it called, I'ma make sure everything, he going to run everything through her.

On or about November 26, 2017, the Defendant placed another call to INDIVIDUAL A, who established a three-way connection to CC-A so that the Defendant could speak directly to her regarding two accounts, ACCOUNT A and ACCOUNT B.    Investigators believe ACCOUNT A and ACCOUNT B are shell corporation accounts involved in additional stolen check and other fraud schemes:

> Defendant:    You gotta make sure that [ACCOUNT A], that [ACCOUNT A], hello? That was for [CC-A's alias], right?   That was for [CC-A's alias], right? You gotta make sure that [stuff] is positive and make sure it's good, like, you gotta plead—
>
> CC-A:          It's good, it's good.
>
> Defendant:    Oh, the money came back into it?
>
> CC-A:          Yeah, it's good.
>
>                …

| | |
|---|---|
| Defendant: | Just make sure all that stuff is good.   [CC-A's alias], what's it called, um [ACCOUNT B], um, what's it called, what's the other jones, what's the other jones, what's the other jones? . . .   [CC-A's alias], [ACCOUNT B], and what's it called, the other jones, the— |
| CC-A: | [ACCOUNT A]? |
| Defendant: | [ACCOUNT A], make sure [ACCOUNT A] is good, [ACCOUNT B], and everything you just, make sure they good and run them, just keep running them, just keep running them.   Everything is gonna be all right.   One of my people gonna, I'm gonna try to talk to my people so at least I can get some, you know, bread, you know. |

## C. Procedural History

On March 22, 2018, the Defendant was indicted by grand jury for the scheme involving VICTIM 1.   *See* ECF 11.   Following negotiations between the government, the Defendant, and the Defendant's counsel, the parties agreed to the plea agreement and two-count Superseding Information pertaining to the Defendant's role in the overall fraud and money laundering conspiracy.   *See* ECF Nos. 16-22.   Defendant entered his guilty plea on or about October 26, 2018.

## SENTENCING CALCULATION

### A. Statutory Maximums and Mandatory Minimums

There is no statutory minimum penalty for a violation of either 18 U.S.C. § 1349 (Count One) or 18 U.S.C. § 1956(h) (Count Two).

A violation of 18 U.S.C. § 1349 predicated on conspiracy to violate 18 U.S.C. § 1344(2) carries a maximum sentence of 30 years of imprisonment; a fine of $1,000,000, pursuant to 18 U.S.C. § 1344; a term of supervised release of not more than 5 years, pursuant to 18 U.S.C.

§ 3583(b)(1); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

A violation of 18 U.S.C. § 1956(h) predicated on conspiracy to violate 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957 carries a maximum sentence of 20 years of imprisonment; a fine of $500,000 or twice the value of the property involved in the transaction, pursuant to 18 U.S.C. § 1956(a)(1); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

The Court must also impose a $100 special assessment under 18 U.S.C. § 3013. Additionally, U.S.S.G. § 5E1.2 indicates that the Court may impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release, and period of probation.

### B.  Sentencing Guidelines Calculation

**Plea Agreement.**   Under the plea agreement, the parties agreed to the following estimated offense level calculations.   ECF No. 17, at 3.   For Count One, the base offense level for conspiracy to commit bank fraud where the actual and intended loss is $5,717,596.23 is 25. U.S.S.G. §§ 2X1.1(a), 2B1.1(a)(1), (b)(1)(J).   Because the offense involved 10 or more victims and sophisticated means, an additional 4 points are added.   *Id.* § 2B1.1(b)(2)(A)(i), (b)(10).[1]

---

[1]   According to U.S.S.G. § 2B1.1 Application Note 9, the sophisticated means enhancement is appropriate where the offense involved "especially complex" or "intricate" means, such as "fictitious entities" or "corporate shells."   Here, the Defendant typically committed the bank frauds by registering fraudulent shell corporations, often in the name of the payee of a stolen

For Count Two, the base offense level for a money laundering conspiracy where the value of the laundered funds is $1,657,170.33 is 22.   U.S.S.G. §§ 2S1.1(a)(2), 2B1.1(b)(1)(I).   A 2-point enhancement applies for a conviction under § 1956.   U.S.S.G. § 2S1.1(b)(2)(B).   In addition, because the offense involves sophisticated laundering, an additional 2 points are added.   U.S.S.G. § 2S1.1(b)(3).[2]   Under grouping rules, the two counts are grouped together and the overall offense level is 29.   *See* U.S.S.G. §§ 3D1.1(a)(1)-(2), 3D1.2(b), 3D1.3(a).

Because the Defendant has accepted responsibility for the offense and has assisted authorities in the prosecution of the misconduct by timely notifying the government of his intention to enter a plea of guilty, the government recommends a 3-level reduction in the offense level.   *Id.* § 3E1.1(a)-(b).   The parties' final estimated offense level is therefore 26.

---

check, and establishing bank accounts in the name of the fraudulent shell corporation using the additional deception of a false ID and/or alias.

[2]   According to U.S.S.G. § 2S1.1 Application Note 5, the sophisticated means enhancement is appropriate where the offense involved "complex or intricate" laundering activity, such as "fictitious entities," "shell corporations," or "two or more levels (*i.e.*, layering) of transactions."   Here, the Defendant's laundering typically involved multiple levels of laundering—such as transferring criminal proceeds to co-conspirators or other accounts under the Defendant's control—often involving *additional* shell corporations and false aliases.

Courts have found it appropriate to apply *both* the sophisticated means enhancement for a fraud offense *and* the sophisticated laundering enhancement for a money laundering offense as long as there is an independent basis for both.   *See, e.g.*, *United States v. Cabrera*, 635 F. App'x 801, 808, 2015 WL 9487925 (11th Cir. Dec. 30, 2015) (unpublished) ("Because the two enhancements recognize and punish different harms from fundamentally different conduct, application of both enhancements is not impermissible double counting . . . ."); *United States v. Kassim*, 598 F. App'x 831, 831 (3d Cir. Apr. 15, 2015) (unpublished).   Here, the Defendant's conduct warrants enhancements at both levels.   For example, in the scheme involving VICTIM 1, the Defendant committed the initial bank fraud using a shell company and his "Walter Douglas" alias.   Then, he laundered the proceeds through additional co-conspirator companies, and moved the bulk of the proceeds through a second bank account in the name of CO-CONSPIRATOR COMPANY 1, which the Defendant established using another false alias, "Glenn Briggs."

**PSR Calculation.**   The government acknowledges that the PSR arrives at a different calculation of the applicable Guidelines—resulting in an offense level of 33—primarily because it begins calculation of Count Two with U.S.S.G. § 2S1.1(a)(1) rather than § 2S1.1(a)(2).   *See* PSR ¶¶ 84-98.   However, the government entered into the plea agreement in good faith, including the estimated Guideline calculation therein, and stands by its commitment to limit its allocution to "no more than the middle of the Estimated Guidelines Range, that is, no more than 87 months."   ECF No. 17, at 34, 5.

**Guidelines Range.**   The plea agreement estimated the Defendant's criminal history score to be 4, resulting in a criminal history category of III.   ECF 17, at 4.   Offense level 26 (the estimated level in the plea agreement) in conjunction with criminal history category III results in a Guidelines range of 78-97 months of incarceration.   The PSR calculates the Defendant's criminal history score to be 11, resulting in a criminal history category of V.   PSR, ¶ 108-10. Offense level 26 (the estimated level in the plea agreement) in conjunction with criminal history category V results in a Guidelines range of 110-137 months.[3]   Offense level 33 (the offense level calculated in the PSR) in conjunction with criminal history category V results in a Guidelines range of 210-262 months.   PSR, ¶ 161.

---

[3] Under the plea agreement, the Defendant acknowledged "that after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding your client's criminal convictions and/or criminal history points may be reached and your client's criminal history points may increase or decrease."   ECF No. 17, at 4.   Further, the plea agreement provides that "the parties are free to argue for a Criminal History Category different from that estimated [in the plea agreement]."   *Id.* at 5.

## SENTENCING RECOMMENDATION

### A. Sentencing Factors

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Sentencing Guidelines are no longer mandatory.   However, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and "should be the starting point and the initial benchmark" in determining a defendant's sentence. *United States v. Gall*, 552 U.S. 38, 46, 49 (2007). Accordingly, this Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *Id.* at 49.

Next, the Court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).   *Id.* at 49-50.   The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a).   *United States v. Rita*, 551 U.S. 338, 347-351 (2007).   The § 3553(a) factors include, *inter alia*:   (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant; (4) the need to avoid unwarranted sentence disparities; and (5) the need to provide restitution to any victims of the offense.   *See* 18 U.S.C. § 3553(a)(1)-(7).

**B. Sentencing Recommendation**

The government recommends that the Court sentence the Defendant to 87 months of imprisonment followed by five years of supervised release.   When the government entered into the plea agreement, it made a judgment that a sentence of 87 months would reflect the seriousness of the Defendant's conduct as well as the history and characteristics of the Defendant, and that such a sentence would be reasonable and appropriate in light of the factors set forth in § 3553(a). The government stands by that assessment today.

**1.  The Nature and Circumstances of the Offense**

The Defendant engaged in a systematic, long-running conspiracy to commit a variety of financial frauds involving at least 10 victims, 15 accounts opened and/or controlled by the Defendant (PNC Account 2318; PNC Account 6681; Capital One Account 7983; TD Bank Account 2079; Citizens Bank Accounts 6958 and 6893; Wells Fargo Account 3302; Citibank Account 8636; Bank of America Account 6583; TD Bank Accounts 2526, 2542, 2568, and 2534; and BB&T Accounts 3627 and 3635); and more than $5.7 million in intended losses.   The Defendant and his co-conspirators then engaged in meticulous laundering activity to ensure that the fraud proceeds could not be recovered.   This was not a momentary lapse of judgment.   It was a concerted conspiracy lasting more than two years, requiring the Defendant to take elaborate steps at each stage, scheme after scheme, year after year:   coordinating with co-conspirators to obtain access to stolen checks, business e-mail compromise schemes, or other frauds; procuring false identity documents; registering fraudulent shell corporations; establishing fraudulent bank accounts; and engaging in convoluted financial transactions by himself as well as with a network of co-conspirators.

21

Indeed, as the documents recovered from the Defendant's apartment show, the Defendant devoted himself to the study of crime.   He printed out the Wikipedia article on bank fraud; he had a journal article on "Online Banking Fraud" in which he underlined key passages by hand; and he appeared to sketch out ideas for new fraudulent schemes on notepaper.   He kept a treatise on false identities, *The Paper Trip I*, with handwritten notes and underlining.   These materials show that the Defendant made a deliberate choice to use his talents for criminal ends.

The Defendant's conduct inflicted more than $900,000 in victim losses—and the losses would have been much higher if the Defendant had succeeded in more of his schemes.   The Defendant, moreover, showed no compunction about whom he was stealing from.   His victims included an individual who happened to call their bank in order to take precautions before an international trip, only to have their account looted by the Defendant and a bank insider (VICTIM 2); an individual saving for retirement (VICTIM 3); an individual attempting to purchase a new home—who lost their entire down payment to the Defendant's fraud (VICTIM 7); a public school system—which the Defendant victimized not once but *twice*, although the second wire transfer of more than $2.1 million was reversed just in time (VICTIM 8); and a medical center (VICTIM 10); as well as numerous companies and small businesses that depended on the payments that the Defendant and his co-conspirators intercepted.   Meanwhile, the Defendant lived the high life, frequenting casinos (which he also used to launder money) and living in a luxury apartment under a borrowed name.

In short, the gravity of the Defendant's offense—his continuous and sophisticated fraud and money laundering conduct, and the harm inflicted on numerous victims—supports a serious term of imprisonment within the Guidelines range.

## 2.   The History and Characteristics of the Defendant

The Defendant is a professional fraudster and money launderer.   He has spent most of his adult life in and out of the justice system and engaging in a pattern of increasingly serious offenses. *See* PSR ¶¶ 100-21 (detailing 7 prior convictions and as many as 11 additional arrests).   The Defendant's history of recidivism and lack of mitigating circumstances provides ample support for a mid-Guidelines sentence of imprisonment.

Significantly, during the period of the Defendant's offenses in this case, he was repeatedly arrested for fraud-related activity in the District of Columbia.   For example, on or about April 8, 2016, the Defendant was arrested after an incident that occurred at a TD Bank branch near Dupont Circle.   *See* PSR, ¶ 107.   On that date, the Defendant entered TD Bank, identified himself using the false alias of Jeffrey Smith, and asked to speak to a customer service representative about his account being frozen.   TD Bank called 911 and two Metropolitan Police Department ("MPD") officers responded to the scene.   The officers attempted to speak calmly to the Defendant within the bank.   The Defendant, however, became agitated and suddenly ran for the door.   He pushed aside the MPD officers and broke one of the officers' fingers.   On his way out, the Defendant slammed open the glass door with such force that it was dislodged from its frame and shattered. Officers pursued the Defendant on foot and eventually apprehended him.   *See* Ex. H (TD Bank Surveillance Footage).   At the time of his arrest, the Defendant was carrying three different photo IDs with different names and dates of birth.   The Defendant was initially charged with two counts of Assault on a Police Office and one count of Destruction of Property.   *See United States v. Jeffrey Smith, a/k/a Michael Afam Orji*, No. 2016-CMD-005263 (D.C. Super. Ct.).   Out of

consideration for the Defendant's immigration concerns, however, the Defendant was allowed to plead to two counts of simple assault.

Just two months later, on or about June 7, 2016, the Defendant was arrested again, in a similar scheme, on the charge of attempted uttering in the District of Columbia.   *See* PSR, ¶ 119. The Defendant entered a Bank of America near Dupont Circle and attempted to withdraw $3,800 using his Bank of America debit card.   The Defendant presented a false driver's license in the name of Samuel Austin.   The bank teller grew suspicious and contacted the police.   The Defendant was placed under arrest, but the case was eventually dismissed by nolle prosequi.   *See United States v. Michael A. Orji*, 2016-CMD-008716 (D.C. Super. Ct.).

These arrests show that the Defendant was on a fraud spree in the District of Columbia and elsewhere, and that he was not deterred by law enforcement intervention.   Indeed, the arrests occurred in the midst of the conspiracies charged in this case.   Even after being arrested, twice, the Defendant continued to participate in the fraud and money laundering conspiracies for more than a year, including the schemes targeting VICTIM 4, VICTIM 5, VICTIM 6, VICTIM 7, VICTIM 8, VICTIM 9, and VICTIM 10 between November 2016 and October 2017.   The only thing that stopped him was his arrest and detention in this case—and even then, the Defendant tried to continue his criminal activities *from inside D.C. Jail* through his co-conspirators.

Finally, the Defendant has had every opportunity to succeed and pursue a legitimate livelihood.   By all accounts, he comes from a stable family of first-generation immigrants, with well-educated parents who worked to provide the Defendant and his siblings with all the opportunities of life in America.   *See* PSR ¶ 123-25.   Instead, the Defendant made a deliberate choice to turn to a life of crime—and he has confirmed that decision over and over again.   The

Defendant's troubling history and characteristics underscore the willfulness of his offenses and the need for a serious term of imprisonment, both to incapacitate him from committing further offenses and to specifically deter him from resuming his fraudulent conduct upon release.

### 3. The Need for the Sentence Imposed To Reflect the Seriousness of the Offense, To Promote Respect for the Law, To Provide Just Punishment; To Afford Adequate Deterrence; and To Protect the Public from Further Crimes of the Defendant

The Defendant's fraud and money laundering offenses were deliberate and systematic, they caused substantial harm, and they were undeterred by repeated law enforcement intervention. The sentence in this case should reflect the seriousness of the underlying offense as well as the need to incapacitate and provide specific deterrence for the Defendant.

While the Defendant engaged in a variety of fraudulent schemes, the BECs merit particular attention.   BEC schemes represent a growing worldwide threat.   U.S. law enforcement estimates that BECs and similar e-mail account compromise schemes are responsible for more than $3.7 billion in worldwide losses.   *See* U.S. Department of Justice Press Release, *74 Arrested in Coordinated International Enforcement Operation Targeting Hundreds of Individuals in Business Email Compromise Schemes*, June 11, 2018, available at https://www.justice.gov/opa/pr/74-arrested-coordinated-international-enforcement-operation-targeting-hundreds-individuals.   And, as this case shows, BECs are inherently difficult to investigate and prosecute.   Cyber criminals operating online can reach victims anywhere in the world, as illustrated here by the fact that the conspiracy targeted victims in Texas, New Jersey, and Colorado.   BECs also frequently involve multiple layers of false identities, as here.   The difficulty finding and prosecuting the criminals

involved in BEC schemes supports a significant term of imprisonment to deter others from participating in similar schemes.

Moreover, as this case illustrates, financial fraud often goes hand-in-hand with money laundering. The money laundering statutes are intended to take the profit out of crime—to target "not only certain unlawful cash-generating schemes, but also the means by which they are practically carried out and hidden from investigators." *United States v. Iacoboni*, 363 F.3d 1, 6 (1st Cir. 2004); *see also United States v. Bockius*, 228 F.3d 305, 310 (3d Cir. 2000) ("Congress intended to punish [the] use of criminally derived proceeds separately from and in addition to the criminal conduct which produced them."). As the D.C. Circuit has noted, the gravity of the harm caused by money laundering is reflected in the applicable Sentencing Guideline: "'[U.S.S.G.] Section 2S1.1 measures the harm to society that the money laundering causes to law enforcement's efforts to detect the use and production of ill-gotten gains.'" *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1356 (D.C. Cir. 2002) (quoting *United States v. Allen*, 76 F.3d 1348, 1369 (5th Cir. 1996)).

Indeed, money laundering was a critical element of the schemes charged in this case. Those schemes typically required the Defendant to provide the bank account to receive the fraud proceeds, and then rapidly liquidate the funds—often involving additional bank accounts and co-conspirators—before the fraud could be detected and reversed. The sentence here should reflect the key role played by the Defendant in *both* facilitating the underlying bank fraud *and* laundering the resulting criminal proceeds—thus ensuring the success of the overall criminal scheme.

Given the seriousness of the harm inflicted by the Defendant's conspiracies, it is important to impose a sentence that will be sufficient to discourage others from participating in such schemes.

26

Indeed, general deterrence is a "crucial factor in sentencing decisions for economic" crimes. *United States v. Morgan*, No. 13-6025, 635 F. App'x 423, 450 (10th Cir. Nov. 6, 2015) (unpublished).   The legislative history of section 3553 documents Congress's emphasis on general deterrence in white-collar crime.   *See* S. REP. 98-225, 76, 1984 U.S.C.C.A.N. 3182, 3259 (need to deter others is "particularly important in the area of white collar crime").   "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."   *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotations and citation omitted). Imposing a sentence of 87 months of imprisonment would promote respect for the law and send a message that fraud and money laundering are grave offenses that warrant real punishment, as Congress and the Guidelines intend.

### 4.   The Need To Avoid Unwarranted Sentencing Disparities

The principal method to avoid unwarranted sentencing disparities is to adhere to the Sentencing Guidelines range.   *See Gall v. United States*, 552 U.S. 38, 54 (2007) ("Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities.").

### 5.   The Need To Provide Restitution

Restitution is an important factor in this case, where the Defendant's conspiracy caused losses of more than $900,000 to at least five victims.   However, given the Defendant's limited financial resources, lack of legitimate employment, and the likelihood that he will be removed

from the United States following any sentence, the need to provide restitution does not weigh heavily in the determination of his sentence.

## **CONCLUSION**

For the foregoing reasons and the information reflected in the PSR, the United States respectfully requests that the defendant be sentenced to a period of 87 months of imprisonment to be followed by five years of supervised release.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. BAR NO. 472845

BY:    */s/ Christopher B. Brown*
        Christopher B. Brown, D.C. Bar No. 1008763
        Assistant United States Attorney
        555 4th Street, N.W.
        Washington, D.C. 20530
        Tel:  (202) 252-7153
        Fax:  (202)202-514-6010
        Christopher.Brown6@usdoj.gov